CROOKS
*vs*
TURPEN *et al.*

Mandate.

---

## Crooks *vs* Turpen *et al.*

APPEAL FROM THE MONTGOMERY CIRCUIT.

*Guardian and ward. Trustee. Jurisdiction.*

CHIEF JUSTICE ROBERTSON delivered the Opinion of the Court.

WILLIAM LINNEY, who died in the year 1821, by his last will, proved and recorded in the Probate Court of *Iredel* County, *North Carolina*, bequeathed to ten of his infant grand children, who were the children of his son

CHANCERY.

*Case 57.*

*April* 10.

The case stated.

*George Linney*, then of Kentucky, several slaves and the proceeds of other property, to be delivered to "*guardians*" who *should* be appointed to receive and take care of their legacies.

In June, 1822, the County Court of *Bath*, Ky. appointed *Robert B. Crooks guardian* for six of those legatees, and *Barnabas Brunty*, who had intermarried with another of them, seems in like manner, to have been appointed *guardian* for the other three, though their father, who resided in that county, was then living.

Shortly after these appointments, *Brunty*, in his own right, as husband of one, and guardian of three of the legatees, and as attorney in fact of *Crooks*, who, as guardian of the other six, had given him a letter of attorney to act for him, proceeded to *North Carolina*, and received about ten slaves, chiefly children, and a wagon and team, as a portion of the said bequest; and, on several subsequent occasions, he seems to have received from the executors of *William Linney*, sums of money amounting in the aggregate, together with the value of the wagon and team, to about $2550; about $528 of which he paid over to *Crooks*, to whom also he seems to have delivered six-tenths of the slaves.

In 1831, *George Linney* having died and a statutory guardian being appointed in lieu of *Crooks*, the six persons for whom he had acted as guardian, sued him in chancery for an account, alleging that he had assumed to act without legal authority, and calling on him for a discovery as to money and hire, admitting that they had received all their slaves since the appointment of their regular guardian.

In his answer he exhibited a settlement with the County Court of *Bath*, showing a balance against the complainants of about $200, and insisted that he had never collected from *Brunty*, or otherwise, more than was charged against him in that settlement; $528 only being therein charged for money received from the executor.

On the final hearing of the case, the Circuit Judge, charging *Crooks, as a guardian*, with six-tenths of the whole amount advanced by the executors to *Brunty*, and with compound interest thereon, and refusing any credit

either for unavailable notes for hire or for alleged contributions (for maintenance) to *George Linney*, who appears to have been insolvent—rendered a decree against him for $3401 78 cents.

It is that decree which *Crooks* now seeks to reverse.

Although the testator, *William Linney*, in requiring guardians for the infant children of his son *George*, then living, probably contemplated such appointments as were actually made, according to a then prevalent but erroneous practice in similar cases: yet, nevertheless, the County Court had no jurisdiction, and therefore, even if its appointment of *Crooks* might be considered a virtual execution in fact of a power, as intended by the will, he cannot be deemed to have been *de jure, a guardian.*

But as he seems to have acted in good faith, without intending usurpation, assumption, or wrong, he should undoubtedly be considered and treated in a Court of *Equity* as an *ordinary trustee*, so far as his liability to these for whom he acted may be concerned.

But whether he be considered as a trustee or usurper, he is certainly not chargable with compound interest on money never in his hands or in any way appropriated to his use. Even as legal guardian, he would not be liable to any such penalty unless he had been guilty of collusion or gross delinquency, amounting to fraud, of which there is no pretence of proof. In this particular, therefore, the decree is erroneous.

But, though he could not have coerced payment to himself from the executors, yet if, under the semblance of legal authority in him as guardian, he induced them to make advances to *Brunty* as his agent, he certainly may be liable to the appellees for whatever was so obtained, and simple interest thereon, to be computed from the time when, as a faithful trustee, he ought to have made the fund productive. Nevertheless, if *Brunty* has retained in his own hands, more than the legatees, whom he represented, were entitled to, he also is liable to the appellees: but to what extent he may have done so, is altogether uncertain. Nor has it been shown conclusively, how much he received as the agent of *Crooks*, and how much as representing others.

One who is irregularly appointed guardian, will nevertheless, where he has been guilty of no fraud, be treated by the chancellor as an ordinary trustee and legal guardian.

Such person will be held to ac't for all monies received, and simple interest thereon from the time, as a faithful trustee he should have made it productive.

Courts of Equity require all persons concerned in interest to be made parties.

Wherefore, in a Court of Equity, which delights to impose burdens in their natural order, distribute them justly, and prevent multiplicity of suits, it seems to us that *Brunty* should be a party.

Moreover, as it does not satisfactorily appear that *Brunty* might not have had an equitable right to retain for those legatees whom he represented, nearly the whole of the funds which he seems to have withholden from *Crooks,* and as it is, besides, far from being improbable that the appellees have received, through *Ex-Governor Barbour,* of *Virginia,* a portion of the joint legacy for which the other four legatees might be entitled to a retainer of a portion of the fund withheld by *Brunty* from *Crooks:* it seems to us, that not only *Brunty,* but the four legatees whom he represented, should be brought before the Court for the purpose of adjusting, satisfactorily and conclusively, the blended interests of all concerned immediately or eventually.

And therefore it is our opinion, that for want of all proper parties, the decree was premature and improvident.

A settlement made by the Ct'y Court with one who was guardian *de facto* and not *de jure,* is not *per se, prima facie* evidence in his favor—and to attack such settlement by specific objections thereto will not be required of a complainant.

Allowances made to a guardian *de facto* of infants, whose father is in indigent circumstances, in a settlement with the County C't without objection, then or on bill filed by wards for settlement, will be presumed justly allowed, and sanctioned by the Chancellor—

The County Court, having no jurisdiction to settle Crooks' accounts, as a guardian, the settlement exhibited by him is not, *per se, prima facie* evidence in his favor.

But still, although specific objections to it should not be required in the bill, as would have been necessary had it been judicial, it is in some respects entitled to influence, under the peculiar circumstances of this case. Some of the appellees were adults when their bill was filed, and most of them were probably such before the decree was rendered. One of the credits, allowed in the settlement, was for contributions alleged to have been made by *Crooks* to the father of the appellees, for providing for their maintenance. Some such allowance, in the absence of either allegation or proof gainst it, must be felt as intrinsically just and reasonable, especially when the father's own apparently humble and destitute condition is considered; and the simple fact that the allowance was made by intelligent and impartial men, acting, as they supposed, in an official and authoritative capacity, and *that the appellees have not, in any mode,*

intimated any objection to it, should, in our opinion, entitle it to the sanction of the Chancellor.

And, the said allowance being refused, it does also appear to this Court harsh, at least, to charge *Crooks*, as the decree has done, with the amount of a promisory note given by the said *George Linney* for the hire for one year of some of the slaves of the appellees, when it is not only doubtful whether the note could have been enforced by the most vigilant and prompt prosecution of legal remedy, but almost certain that the owners of those slaves were, themselves, supported, in part, by the services for which their father gave that obligation to their guardian *de facto*.

Nor will the guardian *de facto* of the infant children of one who is in indigent circumstances, be compelled by the Chancellor to account for the hire of a slave held by the father, on whose labor and services the wards were supported.

Nor if, as appears probable, another small note, with which he has been charged, was the obligation of the present guardian, was it proper to subject *Crooks* to the amount of it.

And, as the wagon and team were probably necessary for transporting the young slaves, neither the *bona fide* purchase nor sale of them should be deemed a breach of trust; and they should not be, as they seem to have been, charged at a higher price than that for which they were sold.

Wherefore, the decree of the Circuit Court is reversed, and the cause remanded for such further proceeding and decree as may be proper, according to the principles of the foregoing opinion.

*Owsley and Apperson* for appellant: *Hanson* for appellees.